IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
TEXARKANA DIVISION


JACOB JAMES TOWNSEND                                                          PLAINTIFF

                    v.                          Civil No. 4:12-cv-04072

OFFICER PIERRE
SUMMERVILLE; OFFICER SIMEON AMES;
and LT. KEVIN MELLSON                                                         DEFENDANTS


**MEMORANDUM OPINION**

This is a civil rights action filed by Plaintiff, Jacob Townsend, pursuant to the provisions

of 42 U.S.C. § 1983.  Plaintiff proceeds *pro se* and *in forma pauperis* and is currently incarcerated

in the Arkansas Department of Correction Tucker Unit in Tucker, Arkansas ("ADC").  The Parties

have consented to the jurisdiction of a magistrate judge to conduct any and all proceedings in this

case, including conducting the trial, ordering the entry of a final judgment, and conducting all post-

judgment proceedings.  ECF No. 41.  Pursuant to this authority, I held a bench trial on April 7,

2015 and now issue the below findings of fact and conclusions of law.

1.     **BACKGROUND**

The events at issue here, occurred while Plaintiff was incarcerated in the Hempstead County

Detention Center ("HCDC").  Plaintiff is now incarcerated in the ADC.  Plaintiff alleged in his

Complaint that his constitutional rights were violated when Defendants Summerville, Ames, and

Mellson used excessive force against him.[1]

---

[1]The Honorable Susan O. Hickey previously dismissed all of Plaintiff's official capacity
claims as well as individual capacity claims against Sheriff Singleton, Johnny Godbolt and Sergeant
Veronica Mauldin.  This leaves only Plaintiff's individual capacity claims against Defendants

At the bench trial, the testimony of the following witnesses was heard: (1) Plaintiff Jacob Townsend; (2) Brandon Martin; (3) Richard Townsend; (4) Joan McClean; (5) Ruben H. Taylor, III; (6) Officer Gary Dorman; (7) Sheriff James Singleton; (8) Johnny Godbolt; (9) Defendant Kevin Melson; (10) Defendant Piere Summerville; (11) Defendant Simeon Ames; and (12) Heath Ross.[2]

Plaintiff offered Exhibits A - M, including: (A) Simeon Ames's Incident Report dated September 8, 2011; (B) Pierre Summerville's Incident Report dated September 8, 2011; (C) September 20, 2013 letter from Nick Windle; (D) Kevin Melson's Incident Report dated September 8, 2011; (E) Defendants' Response to Plaintiff's Second Request for Admissions; (F) Hempstead County Detention Center Use of Force Policy and Procedure; (G) Hempstead County Detention Center Chemical Weapon Policy and Procedure; (H) Inmate Medical Request dated September 10, 2011; (I) Defendants' Response to Plaintiff's Second Request for Production of Documents; (J) Defendants' Response to Plaintiff's Second Request for Production of Documents; (K) Defendants' Response to Plaintiff's Request for Interrogatories; (L) Defendants' Response to Plaintiff's Second Request for Production of Documents; and (M) Inmate Grievance.  Plaintiff's Exhibits A-M were all admitted without objection.

Defendants offered Exhibits 1 - 6, including: (1) Simeon Ames's Incident Report dated September 8, 2011; (2) Pierre Summerville's Incident Report dated September 8, 2011; (3) Kevin

---

Summerville, Ames, and Mellson.

[2] I did not find the testimony of Brandon Martin credible as he stated he did not remember much from the incidents.  Further, I did not find the testimony of Richard Townsend or Sheriff Singleton relevant or helpful to the issues before me.  For these reasons, I have not included summaries of their testimony herein.

Melson's Incident Report dated September 8, 2011; (4) September 10, 2011 Inmate Medical Request with nurse's assessment dated September 16, 2011; (5) Hempstead County Use of Force Policy; and (6) Hempstead County Chemical Weapon Policy.  All of Defendants' exhibits were admitted without objection.

2.      **FINDINGS OF FACT**

The following is a summary of witnesses' testimony and my findings of fact:[3]

**Plaintiff Jacob Townsend**

Plaintiff testified the morning of September 8, 2011 Defendant Summerville let him out of his cell (Cell 8 of C-Pod) and told him to clean C-Pod.  Plaintiff refused to clean C-Pod and Defendant Summerville threatened to spray Plaintiff with pepper spray.  Plaintiff then ran back to his cell and Defendant Summerville did not spray him at this time.

A 309 inmate was brought into clean C-Pod.  Later, it was time for Plaintiff's hour out of his cell.[4]  Defendant Ames opened Plaintiff's cell door.  Plaintiff observed both Defendant Ames and Defendant Summerville had their pepper spray in their hands.  As Plaintiff was walking towards the shower, he commented that the Defendants "were real tough with their mace."  Plaintiff was around Cell-5 and approximately six feet from Defendants Ames and Summerville when he made this comment, and he was walking away from them at the time.  At that time Defendants Ames and Summerville began spraying Plaintiff with pepper spray.  Plaintiff ran to the center of the pod and

_____

[3] These witness testimony summaries are based on the audio recording of the trial as well as my notes taken contemporaneously with the testimony.

[4] C-pod where Plaintiff was housed was a lockdown pod where the inmates were locked inside their cells twenty-three (23) hours a day and allowed out into the dayroom of the pod for one hour each day to shower, use the phone, or exercise.

3

lay down and placed his hands behind his back.  All while the Defendants Ames and Summerville continued to spray him.  One of the officers also continued to spray Plaintiff for several seconds after he was laying down with his hands behind his back for several seconds.  Plaintiff is unsure which of the officers sprayed him after he was laying down.  The officers then got Plaintiff up and escorted him back to his cell.

Once in his cell he put his towel over his face and acted like he was in pain.  Defendant Summerville came into Plaintiff's cell and put his pepper spray under the towel and attempted to spray Plaintiff directly in the face.  According to Plaintiff, Defendant Summerville stated "who is the bitch now" as he was spraying the pepper spray under Plaintiff's towel.  Defendants Ames and Summerville then left Plaintiff in his cell with the door locked.  The officers then put the other inmates from the pod out into the yard and then allowed Plaintiff to decontaminate in the shower.

After Plaintiff got out of the shower, he attempted to make a call on the phone in the pod. Defendant Ames came over the loud speaker and told Plaintiff to get off the phone.  Defendant Ames then came into the pod and got in Plaintiff's face yelling.  Defendant Melson entered about ten (10) seconds after Defendant Ames.  Defendant Ames was shaking his pepper spray can next to Plaintiff's face and yelling "do something."  According to Plaintiff, he was afraid and put his hands behind his back trying not to get sprayed again.  Defendant Summerville came running in with his taser drawn and pointed at Plaintiff.  Plaintiff said, "don't shoot me."

Defendant Ames then said lets go to the cell.  All three Defendants escorted Plaintiff to his cell.  Defendant Ames walked into Plaintiff's cell with him.  Then Defendant Ames said, shut the cell door.  Plaintiff testified that he could not remember if Defendant Summerville also came into his cell, but he does remember that Defendant Melson stayed outside his cell.

4

Once the door was shut, Defendant Ames began choking Plaintiff with one hand and pushed Plaintiff up against the sink.  Plaintiff said "I can't breathe!"  Defendant Melson was watching in through the cell window.  Plaintiff worked around to his bunk and sat down and Defendant Melson got on top of him.  Plaintiff began to black out at this point.  Plaintiff does not remember Defendant Summerville telling Defendant Ames "let's go."  But Defendant Ames did get off of Plaintiff and left the cell.  Plaintiff estimates the incident inside the cell lasted approximately 20-25 seconds or longer.

Plaintiff testified he suffered scratches and bruises on his neck.  The scratches consisted of broken skin.  The scratches lasted approximately one week.  According to Plaintiff, the bruising and marks on his neck where still present when pictures were taken by the investigating officer.  Plaintiff also testified there were some marks, but they had healed some when he was examined by the jail nurse eight days after the incident.

I found Plaintiff was credible for the most part.  However, his testimony at trial included more facts and allegations than the previous renditions of the incidents in the pleadings.

**Defendant Pierre Summerville**

Plaintiff was housed in cell 8 of C-Pod.  Defendant Summerville entered the pod and witnessed feces directly in front of Plaintiff's cell so he let Plaintiff out of his cell to clean the pod. Plaintiff refused and Defendant Summerville ordered Plaintiff back into his cell.  Plaintiff complied. Defendant Summerville then told Plaintiff if he did not clean up the pod his visitation would be revoked and Plaintiff again refused.

A 309 inmate then came to clean up the pod.  After the pod was clean, Defendants Summerville and Ames let Plaintiff out of his cell for his one hour out.  While Plaintiff was out of

his cell he told Defendants Summerville and Ames "I am going to see y'all in the streets," and that he planned to trash the pod again.  Defendant Summerville testified that he did not feel threatened by Plaintiff's comments.

Defendant Summerville then ordered Plaintiff to return to his cell two times and advised Plaintiff he would spray him with pepper spray if he did not comply.  Plaintiff continued to walk to the showers and Defendant Summerville sprayed Plaintiff.  Plaintiff then ran across the pod from approximately cell 6 to cell 2 or 3 and then fell down.  Defendant Summerville sprayed him again. Defendant Summerville cannot remember if Defendant Ames also sprayed Plaintiff.  Defendants Summerville and Ames then helped Plaintiff to his feet and escorted him back to his cell and locked him down.  Defendant Summerville testified that Plaintiff did not resist or fight the officers, but he did disobey their orders.

Defendant Summerville then left the pod to wash his face while Defendant Melson took the other inmates out onto the yard.  Plaintiff was also let back out of his cell to shower but Defendant Summerville was not present during this time.

When Defendant Summerville returned to C-Pod, Defendant Ames was in Plaintiff's face yelling at him.  Plaintiff's hands were behind his back and Defendant Summerville could not recall if Defendant Ames had his pepper spray in his hands.  Defendant Summerville remembers Plaintiff telling Defendant Ames he did not want any problems.  Then Defendants Summerville, Ames, and Melson escorted Plaintiff back to his cell.  Defendant Ames entered with Plaintiff and shut the cell door.  This shocked Defendant Summerville.

Defendant Summerville heard a loud commotion inside the cell.  When Defendant Summerville entered the cell, Defendant Ames was on top of Plaintiff.  Defendant Summerville told

Defendant Ames "lets go" and they both left Plaintiff in the cell.

Defendant Summerville completed an incident report for the September 8, 2011 incident with Plaintiff. This incident report is consistent with his testimony but does not detail the incident inside Plaintiff's cell. The report ends with the fact that Plaintiff was given a shower to decontaminate himself. After this fact in the report, Defendant Summerville states "There is nothing further to report at this time." Defendants' Ex. 1.

The parties also submitted Defendant Summerville's incident report from the day of the incident as an exhibit. This incident report contained in pertinent part:

> I, Officer Pierre Summerville, was located in C-pod conducting cell clean-up. The initial purpose of this cleaning was due to the fact that inmate Jacob Townsend trashed the dayroom with urine and fecal matter. This is not the 1st time Townsend has trashed the pod . . . Once I arrived at Townsend's cell quarters, I unlocked his cell and gave him an opportunity to clean up his cell. I also advised him to clean up the urine and feces contaminated toilet paper he had strewn over the dayroom. He refused to clean both his cell quarters and the urine and feces. He walked out of his cell and walked to the bean hole of another cell, all the while cursing and calling me vulgar and obscene names. I ordered inmate Townsend to go back to his cell, advising him that I only unlocked him for the purposes of cleaning and since he declined to do so, he had no other reason to be out of his cell. Once the inmate was locked down . . . Officer Ames arrived minutes later, along with 309 Jolley, and the dayroom was cleaned. After the cleaning in C-pod was complete and 309 Jolley had exited the pod, it was then time for Townsend to receive his hour out. Officer Ames and I opened his cell but advised Townsend that if he attempted to trash the pod again, he would lose his time out and his visitation privileges would be pulled. Inmate Townsend walked out of the cell and as he walked away stated that he would eventually see us in the street and that once we left the pod he was going to trash the pod again. Taking into consideration his repeated destruction of the pod and verbal threats made by him to officers, I then decided to lock him down until further advisement. Officer Ames and I ordered him back into his cell. Townsend stated that it was bullshit and that he wasn't going back into his cell. Townsend was ordered once again to report to his cell for lock down and advised that failure to do so would result in him being pepper sprayed. Townsend again refused and at that time I sprayed the subject. The subject began to run toward the opposite end of the pod and Officer Ames and I gave chase. Townsend fell to the floor and Officer Ames and I both sprayed the subject. We ordered Townsend again to go to his cell

for lockdown. Townsend then stood to his feet and walked to his cell to be locked down. Once the subject was inside his cell I, Summerville, exited the pod to retrieve the yard key to let the rest of the C-pod inmates out for fresh air . . . I went to booking to wash my face. After all the inmates were secured on the yard, inmate Jacob Townsend was then unlocked and given a shower to decontaminate himself. There is nothing further to report at this time.

(Defendants' Ex. 1, Pierre Summerville's September 8, 2011 Incident Report).

I found Defendant Summerville to be very credible and will rely on his testimony accordingly. I will note that while Defendant Summerville did not include any mention of the incident inside Plaintiff's cell in his incident report on September 8, 2011, he testified to the incident willingly and thoroughly at trial.

**Defendant Melson**

Kevin Melson was employed at the HCDC in September 2011 as the head of maintenance. Defendant Melson testified he was called to C-Pod on the day of the incident because an officer needed help with an inmate. When Defendant Melson arrived in C-Pod there was already pepper spray on the walls and floor of the pod. The first thing Defendant Melson witnessed was Plaintiff being escorted across C-Pod by Defendants Summerville and Ames. Plaintiff was not resisting Defendants Summerville and Ames. According to Defendant Melson, Defendant Ames entered Plaintiff's cell with Plaintiff and instructed Defendant Melson to shut the cell door. Defendant Melson heard Plaintiff tell Defendant Ames he did not want any problems once they were inside the cell. Defendant Ames then pinned Plaintiff against the cell wall with his forearm. Defendant Melson could not see what part of Plaintiff's body Defendant Ames's forearm touched. Meslon also testified he did not know if Plaintiff was struggling against Defendant Ames. Defendant Melson did hear Plaintiff state he could not breathe. Defendant Ames then got on top of Plaintiff while Plaintiff was lying on his bunk. Defendant Melson could not remember if Defendant Summerville had a

8

taser.

Defendant Melson testified he told Defendant Ames he would have handled the situation differently. However, Defendant Melson wouldn't classify Defendant Ames's actions as excessive because Defendant Melson could not be sure Plaintiff was not struggling against Defendant Ames. Defendant Melson also testified that while he did not examine Plaintiff, he did not observe any marks, bruises, or scratches on Plaintiff but only that his neck was "red."

Lastly, Defendant Melson testified that when he observed Plaintiff out in the pod being escorted back to his cell, he was approximately 30-40 feet from his cell in the middle of the day room.

The parties also submitted Defendant Melson's September 8, 2011 incident report as an exhibit for trial. The report included in pertinent part:

> Upon my arrival [in C-Pod] I saw pepper spray on the wall . . . CO Ames was in Inmate Townsend face with pepper spray close to his face. In mate Townsend turned around with his hands behind his back and said he don't want any trouble. CO Ames was yelling in Inmate Townsend face. CO Ames told Inmate Townsend that u think u are bad behind closed door butt u are nothing when u are out of your cell. After Myself, Co. Summerville and Co. Ames escorted Inmate Townsend back to his [cell] CO Ames advised me and Officer Summerville to close the door. I L.T. Melson saw that CO Ames had Inmate Townsend against the wall by the sink. Inmate Townsend worked his way to his bed and when I open the door Inmate Townsend was telling CO. Ames that he couldn't breath and CO Ames was on top of Inmate Townsend When I walked in the cell. L.T. Melson in my own words is that CO Ames was way out of line and it should have been handled like this . . . .

(Defendants' Ex. 3, Kevin Melson's September 8, 2011 Incident Report).

I also found Defendant Melson to be a very credible witness and will rely on his testimony and incident report accordingly.

**Defendant Ames**

Defendant Ames had an encounter with Plaintiff on September 8, 2011. Defendant Ames

9

was called in to escort a 309 inmate into C-Pod to clean up a mess.  Defendant Ames did not use pepper spray on Plaintiff that morning.  Defendant Ames testified that he had his pepper spray out but decided not to use it.

Defendant Ames did get in Plaintiff's face and scream at him.  Defendant Ames told him he was sick and tired of his shenanigans including Plaintiff throwing his feces and urine around the pod, cursing at officers, and talking about officers families.

Then Defendant Ames helped escort Plaintiff from the shower area back to his cell.  Plaintiff was submissive at this point and made no statements that he would not go into his cell.  Defendant Ames then entered Plaintiff's cell with him.  According to Defendant Ames, Plaintiff gave him trouble and resisted once they entered the cell.  Defendant Ames testified he held Plaintiff back so the other officers could leave the cell.  Defendant Ames does not recall the door being shut.  Defendant Ames also testified Defendant Summerville was at the door.  Defendant Ames testified once he had Plaintiff pinned down to his bunk he felt he had Plaintiff under control and Defendant Summerville said "lets go."  Defendant Ames then left Plaintiff in his cell.  Defendant Ames testified he pinned Plaintiff with his forearm.

The parties also submitted Defendant Ames's incident report from September 8, 2011.  The report included in pertinent part:

> I escorted 309 Christopher Jolley to C-pod to clean the dayroom.  After 309 Jolly cleaned the dayroom he returned to Booking.  Officer Summerville Opened inmate Townsend's cell for his hour out but after Townsend stated he was going to trash the pod again after we left, Officer Summerville ordered Townsend to return to his cell and Townsend refused to go to his cell resulting in the use of pepper spray securing Townsend in his cell.  Sgt Mauldin and myself proceeded to pull the other inmates on the exercise yard for fresh air.  After the other inmates were on the yard, Townsend was unlocked and given a shower to decontaminate himself by showering.  After his shower, I, Officer Ames, ordered him to return to his cell and he refused to do so.  I ordered him to go to his cell and advised him that if he did not go he would

be put into his cell.

(Defendants' Ex. 2, Simeon Ames' September 8, 2011 Incident Report).

I did not find Defendant Ames to be a credible witness. I also find it noteworthy that Defendants Summerville and Melson's incident reports were signed and dated by the respective officer. Further, Defendant Summerville's incident report was also signed by his supervisor Veronica Mauldin and Captain Glover as the reviewing administrator. All signatures on Defendant Summerville's incident report were dated September 8, 2011. Defendant Ames's incident report, however, ends abruptly as quoted above, and only has a blank signature page attached to it. There are no signatures on this attached page. It appears that Defendant Ames either ended his report without completing it or the version of the report in evidence is not the complete original report.

**Heath Ross**

Ross testified he is currently employed with the Hempstead County Sheriff's Office as assistant jail administrator and also in the criminal investigation division. In 2011, Ross was employed solely in the criminal investigation division. Ross testified he implemented a video retention policy at the HCDC when he started as assistant jail administrator January 2014.

Ross initially testified that he could not testify to anything that happened prior to January 2014. Ross did not see any video footage from September 8, 2011 the day of Plaintiff's incident. It would have been Steven Glover that reviewed the video.

In January 2014, Ross changed the HCDC's video system by putting in more cameras with bigger DVRs for longer storage. He also put cameras in blind areas around the jail. Ross now reviews video himself when incidents happen at the HCDC.

Ross eventually testified, in January 2014 there was only one camera in C-pod. It was

located in the far west end of the pod above Plaintiff's cell (Cell-8). There were blind spots in C-pod including directly in front of cell eight. Additionally, any footage around cell two was typically unclear. However, had a chase across the pod from cell eight to cell two occurred it would have been caught on camera. Further, whatever happened around cell two would have been on video but it would not be a clear line of sight.

I find Ross credible and his testimony somewhat helpful, however, Defendants were directed to produce for testimony "such a person or persons familiar with any video footage recorded on September 8, 2011 involving Plaintiff, and such person or persons familiar with the recording and maintaining of video footage at the HCDC in 2011." ECF No. 72. As evidenced by his testimony, Heath Ross did not satisfy the Court's Order because he was not familiar with the video footage from September 8, 2011.

**Joan McClean**

McClean is the nurse at the HCDC. McClean testified that she normally addresses inmates medical requests at her routine exam time. This is why Plaintiff was not examined until September 16, 2011 even though he submitted a medical request on September 10, 2011. McClean also testified she does not come for exams, other than routine exams, unless requested to do so by an officer or for an emergency. McClean testified that no officer called her on September 8, 2011 regarding the incident with Plaintiff.

Also, McClean testified she remembered examining Plaintiff on September 16, 2011. At the time of the exam, Plaintiff did not have any discoloration or broken skin on his neck. McClean testified that in her medical opinion bruising or broken skin could have healed in the eight days from the incident to her exam.

The parties also submitted Plaintiff's medical request related to the September 8, 2011 incident. This requested dated September 10, 2011 states: "I was choked by Officer Ames on 9-7-11 and in the process he scratched severely enough that he broke the skin. I would like an AIDS & Hepatitis test." (Plaintiff's Ex. A, Inmate Medical Request). McClean examined Plaintiff on September 16, 2011 and noted no visible wound or scar on neck and diagnosed Plaintiff with a "healed wound" and explained to the Plaintiff "no injury occurred requiring lab work." (Plaintiff's Ex. A, Inmate Medical Request).

**Ruben H. Taylor, III**

Ruben Taylor testified via a video conference from the Arkansas Department of Correction where he is currently incarcerated. Taylor was housed in C-Pod at the HCDC on September 8, 2011. Taylor's cell was next to the shower in C-Pod. Taylor testified he witnessed Plaintiff be pepper sprayed, Defendants Summerville and Ames yelling, Defendant Ames spitting in Plaintiff's face, and the bruises on Plaintiff's neck.

According to Taylor, Plaintiff was walking to the shower when Defendant Ames asked Plaintiff to mop the floor and Plaintiff refused. Defendant Ames then pepper sprayed plaintiff first and Defendant Summerville sprayed Plaintiff while he was getting on the ground. Taylor also said that Defendant Summerville sprayed Plaintiff while Plaintiff was walking into his cell. Taylor testified that Plaintiff never ran anywhere.

From outside on the yard, Taylor saw Defendants Summerville and Ames enter Plaintiff's cell with Plaintiff while Defendant Melson stood outside the door. Taylor also testified that he witnessed the bruises on Plaintiff's neck from choking. After the incident Taylor called Plaintiff's family for him so they could come up and take pictures of Plaintiff's neck.

13

I find Taylor's testimony only somewhat credible.

**Officer Gary Dorman**

Dorman is employed by the Hempstead County Sheriff's Office.  Dorman testified that he did talk with Plaintiff about the September 8, 2011 incident at the HCDC but he does not recall taking pictures of Plaintiff's injuries.  Dorman also testified that he looked through his files and he could not locate any pictures of Plaintiff's injuries.  Dorman is a narcotics officer and does not usually work incidents at the jail.  Dorman cannot remember how he got involved with Plaintiff's incident but he does remember that he spoke with Plaintiff about it.

I find Dorman credible, however, I do not believe his testimony forecloses the issue of whether there were pictures taken of Plaintiff's injuries.

**Johnny Godbolt**

Godbolt is the jail administrator at the HCDC and served in this position in September 2011.

Godbolt testified that he remembered Plaintiff complaining that he was choked and Godbolt was made aware of the incident through the officer's incident reports.  Godbolt testified there was no reason for Defendant Melson to lie in his incident report.  Defendants Melson, Summerville, and Ames were all given some leave of absence time as a result of the September 8, 2011 incident with Plaintiff.  Defendants Melson, Summerville, nor Ames ever received an actual suspension or discipline regarding the September 8, 2011 incident.  Godbolt testified while he did not encourage this type of behavior from his officers he did not feel Defendants Melson, Summerville, or Ames should be suspended because of the incident.

Godbolt testified he did not know much about the video system.  Lt. Glover, the former

14

assistant jail administrator handled the video system and investigated the video related to the incident on September 8, 2011.  Godbolt also testified that he would normally request video footage be saved but here there was nothing on the footage to save.  The incident inside the cell was not caught on camera and neither was the pepper spray incident out in the pod caught by the camera.  Godbolt admitted he was aware of the incident in time to save the video footage, and he or Captain Glover reviewed the video footage from C-Pod.  However, Godbolt maintained that there was nothing on the video footage that warranted saving it.

Godbolt did not have any useful testimony regarding whether pictures were taken of Plaintiff's injuries during the investigation.

I did not find Godbolt's testimony credible, particularly his claim there was nothing on the video of the incident that warranted it being saved.

**3.** **CONCLUSIONS OF LAW**

Plaintiff's only remaining claim is that Defendants Summerville, Ames, and Melson used excessive force against him on September 8, 2011 through the use of pepper spray and Defendant Ames physical altercation with Plaintiff inside of his cell.

A.    Spoilation of Evidence

As an initial matter, the lack of video evidence in this matter, while outside of the control of the remaining Defendants, is troublesome.  Based on the testimony presented from Heath Ross, Defendant Summerville, Defendant Melson, and Plaintiff, portions of this incident would have been contained on the video footage from C-pod on September 8, 2011.  Further, the video footage from September 8, 2011 was reviewed by Administrator Godbolt and non party Captain Glover while investigating the incident on September 8, 2011.  Lastly, the evidence shows Defendants

Summerville, Melson, and Ames all received at least some leave of absence based on the incident. Despite all of this, the administration at the HCDC saw fit to destroy the relevant video footage. However, because the remaining Defendants in this matter lacked authority to retain the relevant video footage, I will not make an adverse inference against them based on the destruction of evidence. However, HCDC officials are advised that such destruction of evidence is not taken lightly by this Court, and should the issue arise again, I will make all appropriate adverse inferences or instructions against any and all responsible parties.

      B.    <u>Excessive Force Standard of Law</u>

According to Plaintiff's Amended Complaint he was a pretrial detainee on September 8, 2011. There was no evidence offered at trial to contradict this allegation. "Because [Plaintiff] was a pretrial detainee at the time of the alleged violation of [his] constitutional rights, we analyze [his] claim against [Defendants] under the Fourteenth Amendment, rather than the Eighth Amendment." *Morris v. Zefferi*, 601 F.3d 805, 809 (8th Cir. 2010) (citations omitted). Therefore, the objective reasonableness standard should be used in the analysis of Plaintiff's excessive force claim. *See Johnson-El v. Schoemehl,* 878 F.2d 1043, 1048 (8th Cir. 1989). The Eighth Circuit Court of Appeals noted:

> [u]nlike convicted prisoners, the state has no right to punish [pretrial detainees]. *Bell v. Wolfish*, 441 U.S. 520, 535, 99 S. Ct. 1861, 1871-72, 60 L. Ed. 2d 447 (1979). Their confinement conditions are analyzed under the due process clause of the Fifth and Fourteenth Amendments rather than the Eighth Amendment's "cruel and unusual punishment" standard which is used for convicted prisoners. *Id*. The injuries detainees suffer must be necessarily incident to administrative interests in safety, security and efficiency. Constitutionally infirm practices are those that are punitive in intent, those that are not rationally related to a legitimate purpose or those that are rationally related but are excessive in light of their purpose. *Id*. at 538, n. 20.

*Johnson-El v. Schoemehl*, 878 F.2d at 1048.

The evaluation of excessive-force claims brought by pre-trial detainees, although grounded in the Fifth and Fourteenth Amendments rely on the same objective reasonableness standard as arrestee claims grounded in the Fourth Amendment. *Andrews v. Neer,* 253 F.3d 1052, 1060 (8th Cir. 2001) (citing *Schoemehl,* 878 F.2d at 1048-9). The use of force must be necessary to some legitimate institutional interest such as safety, security, or efficiency, and the force used must not be in excess of that reasonably believed necessary to achieve those goals. See Schoemehl, 878 F.2d at 1048. The relevant inquiry being whether the officials acted in an objectively reasonable manner in light of the facts and circumstances confronting them without regard to their underlying intent or motivation. *See Graham v. Connor*, 490 U.S. 386, 397 (1989). The Court should consider the reasonableness "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 396. Finally, the Court should consider whether the totality of the circumstances justifies the use of force. *Foster v. Metropolitan Airports Comm'n,* 914 F.2d 1076, 1081 (8th Cir. 1990).

The United States Supreme Court recently confirmed the Eighth Circuit's application of the objectively reasonable standard to excessive force claims by pretrial detainees in *Kingsley v. Hendrickson*, __ US __, 135 S.Ct. 2466, 2473 (2015). *See Davis v. White*, __ F.3d __, 2015 WL 4528367 at *2 (July 28, 2015). In *Kingsley,* the Supreme Court addressed the legal standard applicable to pretrial detainee excessive force claims holding "a pretrial detainee must show only that the force purposely or knowingly used against him was objectively unreasonable." *Kingsley v. Hendrickson*, __ US __, 135 S.Ct. 2466, 2473 (2015). The *Kingsley* Court noted:

[O]bjective reasonableness turns on the "facts and circumstances of each particular case. *Graham v. Connor*, 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443

(1989).  A court must make this determination from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight.  *See ibid.*  A court must also account for the "legitimate interests that stem from [the government's] need to manage the facility in which the individual is detained," appropriately deferring to "policies and practices that in th[e] judgement" of jail officials "are needed to preserve internal order and discipline and to maintain institutional security."  *Bell v. Wolfish,* 441 U.S. 520, 540, 547, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979).

The Kingsley Court went on to offer a non-exhaustive list of considerations that may bear on the reasonableness analysis of force used:

the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting.

*Id.* (citing *Graham,* 490 U.S. 396).

There are two separate uses of force in issue here.  The first is the use of pepper spray by Defendants Summerville and Ames.  The second is the use of physical force by Defendant Ames inside Plaintiff's cell.  I will address each in turn.

C.    Pepper Spray

The evidence presented at trial was controverted and various versions of the events were offered to the Court.  However, based on the credibility or lack thereof, of the testimony and other evidence offered, I make the following conclusions of law.

The testimony shows that Plaintiff failed to follow two direct orders to return to his cell once he was released from his cell the second time.  Plaintiff also made a threatening comment to Defendants Summerville and Ames that he would see them on the streets.  Defendant Summerville also testified that Plaintiff threatened to trash the pod again.  Defendant Summerville also testified that he warned Plaintiff that he would be sprayed if he did not comply with the order to return to

18

his cell.  Additionally, the testimony indicates that Plaintiff was pepper sprayed before he ran across the pod and again after he ran across the pod and lay down or fell down on the floor of the pod.  Lastly, Plaintiff testified the pepper spray was from behind him and never got into his face and eyes.[5]

> The Seventh Circuit artfully articulates the importance of prisoners following orders:
>
> Orders given must be obeyed. Inmates cannot be permitted to decide which orders they will obey, and when they will obey them . . . Inmates are and must be required to obey orders. When an inmate refuse[s] to obey a proper order, he is attempting to assert his authority over a portion of the institution and its officials. Such refusal and denial of authority places the staff and other inmates in danger.

*Lewis v. Downey,* 581 F.3d 467, 476-7 (7th Cir. 2009), *cert. denied,* 130 S.Ct. 1936 (2010), quoting *Soto v. Dickey,* 744 F.2d 1260, 1267 (7th Cir. 1984), *cert. denied,* 470 U.S. 1085 (1985). "Maintaining institutional security and preserving internal order and discipline are essential goals that may require limitation or retraction of the retained constitutional rights of both convicted prisoners and pretrial detainees."  *Bell v. Wolfish*, 441 U..S. 520, 546 (1979). "Prison administrators . . . should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security."  *Id.* at 544.  This deference is not only afforded to situations responding to actual confrontations with riotous inmates but also applies to "prophylactic or preventive measures intended to reduce the incidence of these or any other breaches of prison discipline." *Whitley v. Albers*, 475 U.S. 312, 322 (1986).  I find the testimony shows Defendants Summerville and Ames were objectively reasonable in believing some force was necessary in light

---

[5] I do not find credible Plaintiff's testimony that Defendant Summerville entered his cell and attempted to spray Plaintiff directly in the face with pepper spray while Plaintiff covered his face with a towel.  There is no corroborating testimony to this incident.

of the facts and circumstances confronting them when Plaintiff defied two direct and unambiguous orders to return to his cell..

I now turn to whether the particular force used was in excess of what a reasonable officer faced with the situation at hand would believe necessary to achieve the goals of restraining Plaintiff and maintaining security in the HCDC. *See Kingsley,* 135 S.Ct. at 2473; *see also Schoemehl,* 878 F.2d at 1048. Here, Plaintiff defied two direct orders and a warning that pepper spray was imminent if he did not comply. Further, Plaintiff threatened the officers upon his release and threatened to trash the pod again. As the Seventh Circuit explained, by defying officers authority and attempting to assert his own authority, Plaintiff placed the security and safety at the HCDC in jeopardy. *See Lewis,* 581 F.3d at 476-7. Thus, Defendants Summerville and Ames actions in initially spraying Plaintiff were objectively reasonable under the circumstances, and the force used was justified. *See e.g., Walker v. Kemna,* Civil No. 10-4186, 2011 WL 5374567, (W.D. Mo. Nov. 4, 2011) (holding an officer's pepper spray of inmate in a closed locked cell was reasonable when the inmate refused orders to ready himself for transport from the cell). However, spraying Plaintiff with pepper spray after he was down on the floor and compliant with their directives is not objectively reasonable. Once Plaintiff was laying on the floor and compliant he was no longer a threat nor actively resisting returning to his cell. Therefore, Defendants Summerville and Ames are liable for violating Plaintiff's constitutional rights for spraying him with pepper spray after he was subdued and compliant.

D.    Force inside cell

I do not find Defendant Ames use of force inside Plaintiff's cell objectively reasonable. The evidence shows that Plaintiff was released from his cell a third time to shower and

decontaminate from the use of pepper spray.  After his shower, Plaintiff gave no resistance to the officers in escorting him back to his cell.  Further, Plaintiff also stated he did not want any trouble and placed his hands behind his back when Defendant Ames got in his face and yelled at him.  Upon arriving at Plaintiff's cell, Plaintiff and Defendant Ames entered Plaintiff's cell.  Defendant Ames instructed Defendant Melson to close the cell door.  Plaintiff did not resist entering his cell.  Defendant Ames then pinned Plaintiff against the wall and eventually got on top of Plaintiff on his bunk until Defendant Summerville tapped him on his shoulder and told him it was time to go.  Defendant Melson did not enter the cell but heard Plaintiff state he could not breath and witnessed Defendant Ames pinning Plaintiff to the cell wall and to his bunk.  According to Plaintiff, the entire incident inside his cell lasted less than thirty (30) seconds.  The only testimony that Plaintiff resisted at any point during this cell incident came from Defendant Ames.  Defendant Ames testified that Plaintiff did not begin to resist until he and Plaintiff were already inside Plaintiff's cell.

Plaintiff testified that he had scratches that broke the skin and bruising on his neck as a result of Defendant Ames choking him.  Nurse McClean testified that she examined Plaintiff eight days following the incident and at that time Plaintiff did not have any marks or discoloration on his neck.  However, Nurse McClean also testified that in her medical opinion scratching and bruising could have healed over the course of the eight-day lapse from incident to exam.  Taylor also testified that he observed bruising on Plaintiff's neck after the incident.  Lastly, Plaintiff testified that the investigating officer, Dorman, took pictures of his injuries.  Dorman testified he does not recall taking pictures of Plaintiff's injuries, and he looked through his files for any pictures and could not find any.  I credit Plaintiff's testimony that he suffered scratching and

21

bruising from Defendant Ames use of force.

There appears to have been no need for any use of force against Plaintiff once he willing returned to his cell the third time.  *Smoak v. Hall*, 345 Fed. Appx. 134, 140 (6th Cir. 2009) ("There is no government interest in striking someone who is neither resisting nor trying to flee."). Defendant Ames testified that Plaintiff began to give him trouble once they were inside the cell and Defendant Ames was simply controlling Plaintiff so the other officers could leave the cell. This explanation is incredible.  According to Defendants Melson and Summerville neither entered the cell with Defendant Ames and Plaintiff.  Further, according to all accounts Plaintiff entered his cell willingly so the need for Ames to enter Plaintiff's cell at all is unexplained.  Defendant Melson's written report of the incident states in part: *"in my own words is that CO Ames was way out of line . . . "*  Defendant Summerville testified he was "surprised" by the fact that Defendant Ames entered the cell with Plaintiff and shut the cell door.  Accordingly, I find Defendant Ames use of force against Plaintiff inside Plaintiff's cell was objectively unreasonable and violated Plaintiff's constitutional rights.

As for Defendants Melson and Summerville's role in the force used inside Plaintiff's cell, the Eighth Circuit has recognized a non-supervisory officer's duty to intervene to prevent the use of excessive force. *See Livers v. Schenck*, 700 F.3d 340, 360 (8th Cir. 2012).  The evidence shows that Defendant Summerville did in fact intervene once Defendant Ames had Plaintiff pinned to his bunk and tell Defendant Ames it was time to go.  I do not believe Defendant Melson had the opportunity to intervene.  Defendant Melson remained outside the cell, however, the incident inside the cell was  30 seconds.  Additionally, Defendant Melson did report Defendant Ames's actions to HCDC officials once the incident was over.  Thus, I do not find Defendants Melson or Summerville

22

breached any duty to Plaintiff, and they did not violate his constitutional rights relating to the incident inside Plaintiff's cell.

Furthermore, even if Plaintiff's injuries are characterized as *de minimis,* this does not foreclose an excessive force case. The injuries received by a pretrial detainee "must be necessarily incident to administrative interests in safety, security, and efficiency. Constitutionally infirm practices are those that are punitive in intent, those that are not rationally related to a legitimate purpose, or those that are rationally related but are excessive in light of their purpose." *See Johnson–El*, 878 F.2d at 1048. No evidence was presented showing Plaintiff's injuries were necessarily incident to any safety, security, or efficiency concerns at the HCDC.

     E.    <u>Damages</u>

While Plaintiff did not testify as to any lasting physical injuries from the pepper spray or physical altercation with Defendant Ames in Plaintiff's cell, his Section 1983 claim based on the spray is not barred.  The Prison Litigation Reform Act, codified as 42 U.S.C. § 1997e(e), section 803(d) provides as follows:  "No Federal civil action may be brought by a prisoner confined in jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury."  This provision limits the available damages in the absence of a physical injury but does not completely preclude damages.  *See Royal v. Kautzky*, 375 F.3d 720, 723 (8th Cir. 2004) (The physical injury requirement of the PLRA "limit[ed] recovery for mental or emotional injury in all federal actions brought by prisoners" but does not bar the recovery of nominal and punitive damages); *see also Pool v. Sebastian County*, 418 F.3d 934, 942 n.2 (8th Cir. 2005) (Section 1997e(e) presents an issue of damages under the PLRA).  Therefore, the Court finds nominal damages in the amount of $1 are warranted for Defendant Summerville and Ames's actions

in spraying Plaintiff with pepper spray once he was subdued and compliant and $1 for Defendant Ames's use of physical force inside Plaintiff's jail cell. *See Cowans v. Wyrick,* 862 F.2d 697 (8th Cir. 1988) (nominal damages are appropriate when it is impossible to place a monetary value on Plaintiff's damages); *Williams v. Hobbs,* 662 F.3d 994, 1010 (8th Cir. 2011) (nominal damages are meant to vindicate constitutional rights whose deprivation has not caused an actual, provable injury and "one dollar is recognized as an appropriate value for nominal damages").

In section 1983 cases, it has been held that punitive damages are appropriate "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Walters v. Grossheim*, 990 F.2d 381, 385 (8th Cir. 1993) (internal quotation marks and citation omitted). I must consider the two purposes of punitive damages: (1) to punish willful or malicious conduct; and (2) deter future unlawful conduct. *Royal v. Kautzky*, 375 F.3d 720, 724 (8th Cir. 2004). I find Defendant Ames acted willfully and maliciously in using excessive force against Plaintiff inside his jail cell. I determine Defendant Ames's actions were a result of evil motive or intent to harm Plaintiff. As explained above, the evidence here shows Defendant Ames intentionally and unnecessarily entered Plaintiff's cell and asserted force against him. Further, Defendant Ames himself testified that he was tired of Plaintiff's shenanigans. There was no legitimate reason offered for Defendant Ames conduct. The testimony from the witnessing Defendants indicate that Defendant Ames's conduct was "surprising" and "out of line." I respect the fact that detention center officers have a difficult job and must make split-second decisions in situations where their safety or the security of the jail is at risk. However, this is not what occurred here. Defendant Ames was not in danger and HCDC security was not at risk because Defendant Ames could have simply shut Plaintiff's cell door and

walked away.  Instead, he entered Plaintiff's cell unnecessarily and proceeded to exert unnecessary physical force on Plaintiff.

For these reasons, I find punitive damages are warranted to punish Defendant Ames and to deter him, as well as other officers, from such abusive conduct in the future.  Accordingly, I find that Defendant Ames shall be liable to the plaintiff for $5,000 in punitive damages.  *See e.g. Boesing v. Spiess,* 540 F.3d 886, 888-90 (8th Cir. 2008) (upholding jury award of $20,000 in punitive damages where officer sprayed handcuffed arrestee with mace and also struck him with a baton); *Estate of Davis v. Delo,* 115 F.3d 1388, 1396-97 (8th Cir. 1997) (upholding punitive damages award of $5,000 against each defendant where trial court found evidence of malicious or evil intent in officer's beating of inmate while inmate offered no resistance).[6]

## 4.   CONCLUSION

For the reasons stated herein, judgment shall be entered against Defendants Summerville and Ames in their individual capacity.  Nominal damages in the amount of $1 shall be awarded in favor of Plaintiff against Defendant Summerville and $1 in nominal damages in favor of Plaintiff against Defendant Ames; and Defendants Summerville and Ames shall be required to pay,

---

[6]The Court notes that Defendant Ames failed to present any evidence concerning his net worth.  The Eighth Circuit has recognized that the defendant's wealth is but one factor that may be considered in assessing an award of punitive damages, and evidence of a defendant's net worth is not a prerequisite to an award of punitive damages.  *Schaub v. Vonwald,* 638 F.3d 905, 926 (8th Cir. 2011).  "[T]he focus, in determining the propriety of punitive damages, is on the intent of the defendant and whether the defendant's conduct is of the sort that calls for deterrence and punishment over and above that provided by compensatory awards."  *Id.* at 927 (quoting *Coleman v. Rahija*, 114 F.3d 778, 787 (8th Cir. 1997)).  Furthermore, it is the defendants burden to introduce evidence of his net worth in order to minimize any punitive damage award.  *See Grabinski v. Blue Springs Ford Sales, Inc.,* 136 F.3d 565, 570-70 (8th Cir. 1998) (holding that failure to present evidence on net worth at trial constitutes a waiver).  Plaintiff included a request for punitive damages in his Supplement to his Amended Complaint (ECF No. 32) filed on June 20, 2013.  Therefore, Defendants were on notice that punitive damages were in issue here.

25

directly to the Clerk of the Court, the district court filing fee of $350 that has been assessed against Plaintiff.  Defendants Summerville and Ames shall be held jointly and severally liable for the two separate $1 nominal damage awards and $350 fee.  Finally, $5,000 in punitive damages shall be awarded in favor of Plaintiff against Defendant Ames in his individual capacity.  All claims against Defendant Kevin Melson are hereby **DISMISSED** with prejudice.

      **DATED** this **3rd day of September 2015.**


            /s/ Barry A. Bryant                     
            HON. BARRY A. BRYANT
            UNITED STATES MAGISTRATE JUDGE